UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| MUMINA ALI, | * |
| | * |
| Plaintiff | * |
| | * |
| v. | *   CIVIL ACTION NO. |
| | * |
| CITY OF PORTLAND, JEFFREY | * |
| DRUAN, SUNA SHAW and MICHAEL | * |
| SAUSCHUCK | * |
| | * |

COMPLAINT (JURY TRIAL REQUESTED)

NOW COMES Plaintiff Mumina Ali and complains as follows:

STATEMENT OF CLAIMS

1. Plaintiff seeks money damages from Defendants for violation of her state and federal constitutional rights.

2. Plaintiff was the victim of false arrest, use of excessive force and violations of due process by Defendants Jeffrey Druan, Suna Shaw, Michael Sauschuck, and the City of Portland on July 23, 2014 in violation of the Fourth, Eighth and Fourteenth Amendments to the U.S. Constitution and § 5 and 6-A of the Maine Constitution.

3. This lawsuit is brought pursuant to 42 U.S.C. § 1983 and 1988, and 5 M.R.S.A. § 4682- 4684-A.

JURISDICTION

4. This Court has jurisdiction over the claims in this Complaint pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C § 1343 (civil rights) and 42 U.S.C. §§ 1981, 1983, and 1988 (civil rights).

1

5. This Court has supplemental jurisdiction over the pendent state law claims pursuant to 28 U.S.C. § 1367.

6. This action arises under the United States Constitution as applied to state and/or local authorities through 42 U.S.C. § 1983 and the Maine Civil Rights Act, 5 M.R.S.A. § 4682 to 4684-A.

VENUE

7. Venue is proper in this district based on 28 U.S.C. § 1391(b), as Defendants are residents of this district and the acts or occurrences giving rise to these claims occurred in this district.

PARTIES

8. Mumina Ali (Mumina and/or Plaintiff) is a resident of Portland, Cumberland County, State of Maine.

9. Defendant City of Portland (Portland) is and was at all pertinent times a political subdivision of the State of Maine, organized and existing under and by virtue of the laws of Maine. Plaintiff bases all applicable claims as to Defendant Portland for municipal liability pursuant to *Monell v. Dep't of Soc. Services of City of New York,* 436 U.S. 658 (1978).

10. Defendant Jeffrey Druan (Druan) at all pertinent times was a police officer acting on behalf of the Portland Police Department (PPD), City of Portland, a community policing officer with the East Bayside Community Policing Center (EBCPC) and acting under the color of state law. He is sued in his individual capacity.

11. Defendant Suna Shaw (Shaw) was at all pertinent times the Community Policing Coordinator for the EBCPC in Portland, Maine, a Portland employee and, along with unknown Portland policymakers, had supervisory and final policy-making authority over the EBCPC

policies and procedures. She was acting under the color of state law. She is sued in her official and individual capacities.

12. Defendant Michael J. Sauschuck (Sauschuck) was at all pertinent times the Police Chief of the PPD and had final policy-making authority over PPD policies and procedure and Community Policing Centers (CPC) policies and procedures. He was acting under the color of state law. He is sued in his official capacity only.

## GENERAL ALLEGATIONS

13. Plaintiff restates and reasserts all allegations set forth in the previous paragraphs.

14. Plaintiff Ali is an African American political refugee from Somalia and a United States citizen. She spent eight years in a refugee camp in Kenya before moving to the United States in 2005, and Maine in April 2006.

15. Civil war caused Mumina and her four children, then ages 12, 11, 8, and 3 to flee their farm in Baydowa, Somalia and walk 370 miles to Dadaab, Kenya in 1997. Mumina was nine months pregnant and gave birth to her fifth child (HA) during the trip.  Prior to leaving Somalia, Mumina's non-violent tribe was subjected to civil and tribal warfare suffering beatings, torture, rape and murder. Much of this conduct was committed by military personnel. Members of Mumina's family were assaulted during the war.

16. At the Ifo Refugee Camp in Dadaab, Kenya, Mumina was beaten by a male assailant on one occasion and attacked by a man with a knife on another.

17. In the United States Mumina and her family have not fared much better. One of her daughters (SA), suffering from severe Post Traumatic Stress Disorder (PTSD), was repeatedly harassed by the PPD from the age of 14 until she was 20, ending in or about 2014. A son was

beaten by a PPD officer for no apparent reason in 2013 and false charges brought against the son later dismissed.

18. The PPD and the CPC twice facilitated the Department of Health and Human Services (DHHS) taking temporary custody of two of Mumina's daughters for invalid reasons, both times proceeding to court hearings and the return of the children to Mumina who was found to be a fit parent.

19. Twice the PPD, Shaw, the CPC and the Portland Housing Authority worked together to improperly evict Mumina and her family based on false allegations by the PPD and Shaw.

20. It was known to the PPD and EBCPC that SA suffered from periodic mental health issues. On numerous occasions Mumina and her family turned to the PPD for crisis assistance. PPD failed to provide crisis intervention and treated the mental issues as law enforcement issues instead.

21. On one occasion in 2013 when crisis intervention was requested for SA, then suffering from a post-traumatic stress disorder (PTSD) exacerbation, three PPD officers showed up, barged into Mumina's house, removed all the occupants, searched the house, and incapacitated SA by shooting her in the chest with rubber bullets.

22. Mumina's home was searched by the PPD, without a warrant, and without probable cause on multiple occasions.

23. This type of conduct by the PPD, CPC and DHHS in the Somali communities of Portland was common practice. Although black Americans account for only 7 per cent of Portland's population, they represent a disproportionate number of arrests. In 2017 for example, black Americans accounted for 23% of arrests, and 26.1% of "reported" uses of force in Portland.

A black American was almost four times more likely to be subjected to the use of force in 2017 than a white American. This is not new.

24. In 2013, the last time arrest numbers were compiled in Portland before the George Floyd killing, and following the death of Michael Brown in Ferguson, Missouri, 18% of all Portland arrests were of black Americans, who were 2.73 times more likely to be arrested than white Americans. This number was higher than the national average of 2.42. Defendant Sauschuck not only was aware of these disparities in Portland policing, but spoke on the subject in 2014.

25. At all pertinent times PPD policies and procedures lacked sufficient de-escalation training, mental health training and focused primarily on weapons training in use of force situations. The PPD lacked adequate implicit bias training, and/or arrest and use of force training involving the arrest of black Americans and non-English speaking suspects.

26. The PPD lacked adequate policies and training in the use of five-point restraints and the risk of asphyxiation as a result of compressing an arrestee in a prone position with weight on the back, particularly when combined with behind the back handcuffing and the subject in a stomach-down position.

27. At all pertinent times the PPD lacked adequate investigatory procedures for ascertaining unnecessary force events and for investigating complaints against police officers for unnecessary force and illegal arrest and failed to adequately investigate such claims.

28. At all pertinent times investigations of complaints by black Americans and specifically Somali refugees were inadequate, in part because inadequate translation services were used by the investigating committee and because no signed or recorded statement was taken from non-English speaking complainants.

29. A Portland Police Citizen Review Subcommittee (CRS) was utilized solely for the purpose of assessing whether a police misconduct investigation was "thorough, objective, fair and timely". The CRS had no authority to hold police officers accountable and always approved the investigatory actions taken by Internal Affairs. The CRS was ineffective and used by Portland as "cover".

30. At all pertinent times Portland utilized CPC to "manage the hotspots and disorderly houses" in specific areas of the city. CPC offices were placed only in predominantly black American public housing locations. The CPC have police and social worker presence in each location. It was a practice of the CPC to, along with the PPD, improperly designate certain minority housing as "disorderly houses" in order to exercise discriminatory power and control. It was a practice of the CPC to use its position of being involved with high risk youth to have the DHHS improperly investigate and take custody of certain refugee, immigrant and minority children as, in part, a method of exercising discriminatory power and control over immigrant and minority families and their culture. The CPC used fear to exercise control over the immigrant minority population.

31. At all pertinent times the PPD and CPC engaged in over-patrolling the immigrant black American population. Over-patrolling is part of a "broken windows" policy stemming from the 1980's which justified continued use of excessive patrolling, fear and force to exert control over black Americans first begun by police departments in the Northeast United States during the Jim Crow era. At all pertinent times Patrol cars and/or foot patrol were a constant in the Kennedy Park area and other minority neighborhoods. PPD officers routinely detained black Americans between 17 and 25 years old in those areas and questioned and searched them without reasonable suspicion of involvement in criminal activity.

32. DHHS removal of children from indigenous peoples was a well-known tactic utilized to try to extinguish indigenous cultures in Maine. As recently as 2001 DHHS removed 20% of the minor children from the Maliseet Tribe in northern Maine. This was five times the national average of children removed from homes and described as cultural genocide. Black Americans are also over-represented in the foster care system in the United States. Shaw and the CPC in alliance with the DHHS and local DHHS social worker Darlene LNU disproportionately investigated minority children for removal from their families.

33. The Maine criminal system incarcerates black Americans at a much higher rate than white Americans. Overall black Americans represent 1-2% of the Maine population, yet represent 12% of the prison population as of 2018. White Americans represent 94% of the Maine population yet represent only 83% of the prison population as of 2018. Black Americans are more than twelve times more likely to be incarcerated in Maine than white Americans. Black Americans are also sentenced disproportionately in Maine with black Americans accounting for 21 percent of Class A felony drug offenses in 2018 and disproportionately for other Class A and B felonies.

34. Portland at all pertinent times kept race-based crime and arrest statistics as required by the federal government for Federal Bureau of Investigation analysis.

35. On or before July 23, 2014 policymakers for Portland had not effectively addressed the impact of race-based policing in Portland even though policymakers were aware that black Americans were disproportionately targeted by the PPD and intentionally subjected to racially biased policing methods which directly caused civil rights violations of black Americans.

36. On July 22, 2014, Mumina's eldest daughter SA was arrested by PPD and thrown in jail. Mumina's youngest child HA, then 16 and tasked with navigating the legal system for the family because she spoke the best English, called Cumberland County Jail and asked why her sister

was once again being harassed by the PPD and that it was making HA think of harming herself. Within a very short amount of time HA was handcuffed with hands behind her back and put in a police car by EBCPC police Officer Jeffrey Druan. HA had never been in trouble or arrested as a juvenile and was so upset she vomited in the police car. At or about the morning of July 23, 2014 HA was taken to the Maine Medical Center (MMC).

37. HA was not asked by Officer Druan what she meant by saying PPD's conduct was making her want to harm herself, nor if she had any present intention of hurting herself. No social worker was present. Had HA been asked she would have explained that she never intended nor wanted to harm herself, that she had tried but could not get law enforcement's attention in any other way, and as a 16 year old trying to save her sister she made that statement as a last resort.

38. Despite other family members presence when HA was taken, Druan did not speak to anyone or tell them what he was doing or where they could find HA. They had no idea why HA had been arrested. In desperation Mumina walked to the Portland Police Station, the Cumberland County Jail, the Mercy Hospital and then finally went to the Maine Medical Center (MMC) emergency room in search of her daughter.

39. In July 2014 Mumina could not read English. She spoke very little and understood only a bit more. Mumina was able to communicate that she needed a Somali interpreter, and an MMC employee told Mumina that they would get one. The employee confirmed that HA was at the MMC. Two translators were contacted but neither spoke traditional Somali, the most common Somali dialect. The MMC employee continued to search for a third interpreter.

40. Towards the end of a three hour wait for an interpreter, Shaw, DHHS social worker Darcy LNU and Druan who were tending to HA arrived at the MMC Emergency Department where Mumina was waiting and told Mumina that she had to sign a document. Mumina indicated

that she was waiting for an interpreter and needed that interpreter to read the document. Upon information and belief, Shaw, as Community Policing Coordinator knew Somali speaking individuals and interpreters but made no effort to obtain assistance. Mumina refused to sign the document without the assistance of an interpreter fearing that the document would sign over custody of her daughter HA to the DHHS.

41. Shaw became frustrated and angry and shoved the document into Mumina's face demanding that she sign it. Mumina again refused to sign and Shaw told officer Druan to immediately remove Mumina from the MMC Emergency Department. Officer Druan aggressively handcuffed Mumina's hands behind her back and walked behind her pushing her in the upper back out the Emergency Department and into the parking area. Mumina was not engaging in any illegal conduct at the time she was taken into custody and there was no probable cause to believe that she had or would engage in such conduct. At all times it was clear that Mumina was lawfully in the MMC Emergency Department seeking to determine what authorities had done with her child. Mumina was unlawfully detained in violation of clearly established constitutional rights, and ultimately illegally arrested when the unlawful detention was unreasonably lengthened.

42. Mumina suffers from significant health issues including asthma, knee injuries from an automobile accident, and back problems. She walks slowly. Druan kept pushing Mumina faster than she could walk. As he pushed her hard from behind her legs gave out and she fell onto the sidewalk as they approached the main entrance to the MMC. Without the use of her hands to break the fall Mumina fell forward, chipped one of her teeth and screamed out in pain and alarm. Immediately Druan put both knees on her back, pushed her head into the ground, then began choking her from behind with his arm and placed a hand over her mouth to muffle her screams as she lay prone on the ground. Mumina was terrified and feared for her life because she was being

choked, unable to breath and in excruciating pain. She tried to communicate to Druan that she could not breath, but it had no effect. Mumina became dizzy and at some point, lost consciousness. When she regained consciousness, she vomited.

43. Druan called the MMC emergency department. After an unknown amount of time Mumina was placed in a wheelchair while still handcuffed and taken to the emergency department. Mumina was terrified, injured and disoriented. MMC records reveal that she was "agitated" and "yelling". Mumina was taken to a trauma room, placed face down on the table, and put in a five-point restraint, effectively "hogtied". A hospital "sock" was forcibly shoved in her mouth to stop her from screaming which, combined with being in a prone position, pressure being applied to her head and neck, and her wheezing, again restricted her breathing and caused her to fear for her life. MMC personnel assisted officer Druan in "hogtying" Mumina and stuffing the sock in her mouth.

44. Shortly after 4 pm Druan and Dr. Higgins determined that they would involuntarily medicate Mumina and Dr. Higgins gave Mumina three intramuscular shots of a combination of the antipsychotic medication Haldol and Ativan. Upon information and belief, MMC and the PPD have developed a "protocol" for dealing with "emergencies" involving Somali and other African refugee populations.

45. Although Mumina never posed a threat of imminent harm to others or herself, at the time she was involuntarily medicated Mumina was hogtied and for that reason alone posed no threat of harm to herself or others. In fact, medical records show that although Mumina was agitated on admission, the only agitated action specifically referenced by Dr. Higgins was "yelling" prior to the involuntary medication.

46. Sometime following the three shots of antipsychotic medication the restraints were removed and Mumina was placed in a small room and kept there. Six hours later, at 10:22 pm,

Mumina was released, still under the serious effects of the medications, given a neck brace and wheeled to the exit. She had to walk home.

47. When Druan pushed Mumina to the ground, placed his knees on her back, put her in a chokehold and then hogtied her he was using excessive force in violation of Mumina's constitutional rights as a pretrial detainee. That excessive force caused permanent injury to Ali's neck and right shoulder. She required in house medical care assistance for the following week and was forced to return to the MMC repeatedly for medical attention. She has lost range of motion in her left arm and shoulder. She is left hand dominant. She is in constant pain and receives treatment on a consistent basis almost six years later. She has incurred significant medical bills as a result.

48. The use of excessive force also severely and permanently emotionally and psychologically traumatized and injured Mumina.

49. Like many refugees in the Somali refugee community Mumina was already fearful of authority when she came to the United States. Following the incidents of July 23, 2014, she became more terrified of law enforcement. In an effort to mitigate PTSD symptoms, including severe anxiety suffered by Mumina when she saw PPD officers or cruisers, HA contacted the PPD and requested that PPD patrol cars not park adjacent to and/or travel by their house on an almost hourly basis. Despite those reasonable requests PPD continued its excessive daily and nightly patrols until 2018 when HA complained to the Portland City manager and demanded that the patrols be stopped. As a direct and proximate result of the use of excessive force Mumina has lived in a state of anxiety, depression and heightened arousal, symptoms of her significantly exacerbated PTSD. She suffers intrusive thoughts from the events of July 23, 2014 and relives those events, both while dreaming and when awake.

50. On July 24, 2014, the day after the incident, Druan hand delivered to Mumina's home a Notice that advised that she and her family were being evicted.

51. On August 15, 2014, The Portland Housing Authority (PHA) conducted a hearing based on the PPD's complaint. The PHA determined that Mumina and her family should be evicted. After Mumina sought legal counsel and representation the eviction proceeding was dismissed because the PPD's representation as to the disorderly conduct were not credible.

52. On July 23, 2014 DHHS took temporary custody of HA and removed her to a group home in Lewiston. After hearing, the Judge denied DHHS' petition for custody of HA, determined that Mumina was fit parent and HA returned home.

53. At an unknown date, Suna Shaw individually and on behalf of the EBCPC served a Notice of Trespass on Mumina precluding Mumina from going to the EBCPC office or receiving available services from the EBCPC.

54. Upon information and belief, the harassment, beatings, attempted evictions and removal of children by the authorities are consistent with institutional abuse of minorities and immigrants.

55. State law precludes MMC from administering antipsychotic medication without the consent of the patient or following strict protocols allowing for medication only in the event the patient is a danger to herself or others. At all pertinent times Mumina was in the custody and control of the PPD which solicited, approved and ratified the conduct engaged in by the MMC.

56. Mumina had a clearly established constitutional right to liberty to be free of involuntary medication.

57. Upon information and belief Dr. Higgins did not fill out the required forms for involuntary medication and failed to comply with state regulations and statutory requirements. PPD violated Mumina's Fourth, Eighth and Fourteenth Amendment rights and the MCRA.

58. Upon information and belief, Defendant Jeffrey Druan failed to fill out a Use of Force Report despite being required to so by standard operating procedures.

59. PPD failed to follow protocol when it was notified of the incident.

60. These oversights are normal practice or custom for officers in the PPD, and upon information and belief, the department does not discipline officers for failing to document their use of force. PPD does not take seriously the excessive force used by its officers on minority populations despite widespread community concerns. Use of Force reports are a well-established best practice for police departments.

61. Upon information and belief, PPD did not conduct a reasonable investigation into Plaintiff's assault, despite their awareness of it and despite such after-incident investigations being best practice for police departments. In fact, PPD internal investigations did not even obtain a written or recorded statement from Mumina as part of the investigation. Without a full statement being available for review by the CRS it was impossible for them to perform their function adequately. Upon information and belief, at all pertinent times it was the policy of PPD to not take written or electronically recorded statements by complainants who did not speak English as a first language.

62. On July 23, 2014, Plaintiff had a clearly established constitutional right to be free from excessive force.

63. Plaintiff did not pose any threat to Defendant Druan, other officers, or civilians.

64. Defendant Druan knew of the danger he placed Plaintiff into by his assault. The force used was objectively unreasonable under the totality of the circumstances.

65. The actions of Defendant Druan constituted clear excessive force. Chokeholds are not authorized under PPD's own policies and procedures except where deadly force is authorized and are the use of deadly force.

66. Druan and Shaw *de facto* arrested Plaintiff without probable cause and subjected her to an impermissible seizure under the Fourth and Fourteenth Amendments of the U.S. Constitution.

67. Upon information and belief, the City of Portland, and PPD employees have been sued before for illegal arrest and excessive force violations, and the PPD failed to investigate or take corrective action to prevent these excessive violations from happening again.

68. Defendants' actions deprived Plaintiff of her right to be free from excessive force and they were motivated by an unconstitutionally enforced policy, pattern of practice, or custom by the PPD. The PPD do not enforce their excessive force policies, they do not properly document incidents of force, they do not adequately investigate allegations of excessive force, and they engage in a policy, pattern of practice, or custom of failing to reprimand or discipline officers' use of excessive force.

## COUNT I
### 42 U.S.C. § 1983 (Fourth Amendment – Excessive Force, False Arrest)
### Defendants Druan and Shaw

69. All previous paragraphs are incorporated herein by reference as though fully set forth.

70. Plaintiff makes a claim under 42 U.S.C. § 1983 for violation of the Fourth Amendment of the U.S. Constitution.

71. The Fourth Amendment does not permit Defendants to use excessive force. "The right to be free from excessive force in the context of an arrest is clearly established under the Fourth Amendment." *Small v. McCrystal,* 708 F.3d 997, 1005 (8th Cir. 2017).

72. "We analyze the excessive force claims of pretrial detainees under an objective reasonableness standard." *Ryan v. Armstrong,* 850 F.3d 419, 427 (8th Cir. 2017). *Kingsley v. Hendrickson,* 135 S.Ct. 2466, 2473 (2015).

73. "Circumstances relevant to the reasonableness of the officer's conduct include 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Brown v. City of Golden Valley,* 574 F.3d 491, 496 (8th Cir. 2009) (citation omitted).

74. The individual Defendants' use of force against Plaintiff was not reasonable under the circumstances and was excessive.

75. At all material times, Druan did not have a reasonable fear of imminent bodily danger from Mumina when he kneeled on her back and applied a chokehold and covered her mouth.

76. Any reasonable police officer would have known that using that degree of force under the circumstances constitutes excessive force in violation of the Fourth Amendment.

77. At all material times Druan did not have a reasonable belief that he or any other person was in danger of imminent bodily harm when he hogtied Mumina and had a cloth stuffed in her mouth.

78. At all material times Druan did not have a reasonable belief that he, or any other person, was in danger of imminent harm when he authorized the involuntary medication of Mumina.

79. As a direct and proximate result of the actions of Defendant Druan, Plaintiff has suffered damages.

80. At all pertinent times Defendants Druan and Shaw were aware that Mumina was lawfully in the Emergency Department at the MMC. They had no reasonable suspicion that Mumina had engaged in any type of criminal activity. At the time Shaw ordered Mumina to be removed from the Emergency Department, and Druan did so, Mumina was improperly detained and/or arrested in violation of her Fourth and Fourteenth Amendment rights.

WHEREFORE Plaintiff requests that this Court enter judgment in the amount of $750,000 for the plaintiff and award compensatory and exemplary damages, attorneys' fees, interest and such other and further relief as this court finds just.

## COUNT II
### 42 U.S.C. § 1983 (Monell) City of Portland, Michael Sauschuck and Suna Shaw

81. All previous paragraphs are incorporated herein by reference as though fully set forth.

82. Municipal bodies are liable for constitutional violations under 42 U.S.C. § 1983 when execution of its official policy or custom deprives an individual of its rights protected under the Constitution. *Monell,* 436 U.S. at 694-95.

83. Such municipal liability exists where a city fails to properly train, supervise, and discipline its employees amounting in a deliberate indifference to one's constitutional rights. *See City of Canton, Ohio v. Daniels,* 717 F.2d 932, 936 (4th Cir. 1983).

84. At all times relevant, Portland, Police Chief Sauschuck and Suna Shaw in her supervisory capacity at EBCPC, and other unknown policymakers, had a duty to properly train, supervise, and discipline their employees and agents in the use of force, and specifically the use of force regarding black American minorities and refugees.

85. Defendants breached that duty in part, by:

   a. Improperly training, authorizing, encouraging or directing officers on proper use of force and the effects of implied bias on that use of force.
   b. Failing to adequately investigate allegations of excessive and/or deadly force.
   c. Failing to meaningfully discipline officers for violations of policy related to excessive force.

86. The policy, pattern of practice, or custom of condoned misconduct is tacitly or overtly sanctioned, as evidenced by the conduct of Defendant Druan, Suna Shaw and Portland's failure to train, supervise, investigate, and meaningfully discipline Druan for his involvement in this incident amounting to deliberate indifference to Plaintiff's constitutional rights.

87. This unconstitutional behavior of officers is carried out pursuant to a policy, pattern of practice, or custom, whether formal or informal, which violates the constitutional rights of persons situated such as the Plaintiff.

88. It was a policy, pattern of practice or custom that police officers not report use of force as required.

89. The use of over-policing, Broken Window policing, excessive force, warrantless searches, improper eviction and child removal methods establishes an overt policy, pattern of practice, or custom of condoned misconduct and is causally related to the violations of Mumina's civil rights.

90. Portland, acting through its policymakers, had knowledge of PPD's harassing and unconstitutional patterns and practices and knowledge that the same gave rise to a risk of violations of citizens' federal rights.

91. Portland, acting through its policymakers, made a deliberate and/or conscious decision to disregard the known risk of harm that would result from the PPD's unconstitutional patterns and practices and was deliberately indifferent to and/or tacitly authorized the same.

92. On or before July 23, 2014, Portland, with deliberate indifference to the rights of arrestees, detainees, and the like, tolerated, permitted, failed to correct, promoted, or ratified a number of customs, pattern, or practices that failed to provide for the safety of arrestees, detainees, and the like during arrest, including but now limited to the handcuffing and restraint process.

93. On or before July 23, 2014, Portland, with deliberate indifference to the rights of arrestees, detainees, and the like, tolerated, permitted, failed to correct, promoted, fostered or ratified a number of customs, patterns, or practices that condoned and required officers to treat members of the Black Community of Portland differently, including but not limited to implementing the use of excessive force at a higher rate against black Americans who did not pose a threat to officers.

94. On or prior to July 23,2014, Portland, with deliberate indifference to the rights of arrestees, detainees, and the like, tolerated, permitted, failed to correct, promoted, or ratified a number of customs, patterns, or practices that shall be further identified in discovery.

95. As a direct proximate cause of the actions of the Defendants, Plaintiff has suffered damages.

WHEREFORE Plaintiff requests that the Court enter judgment in the amount of $750,000 on behalf of the plaintiff and award compensatory and exemplary damages, costs, attorneys' fees, interest and such other and further relief as this court deems just.

## JURY TRIAL DEMAND

96. Plaintiff demands trial by jury on each count so triable.

Dated July 22, 2020 in Portland, Maine.

        Respectfully submitted,

        */s/ Thomas F. Hallett*

        Thomas F. Hallett, Bar No. 3142
        *Attorney for Plaintiff*
        HALLETT WHIPPLE WEYRENS
        6 City Center, Suite 208
        P.O. Box 7508
        Portland, ME 04112-7508
        PH: 207-775-4255
        thallett@hww.law